# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GUARANTEED RATE, INC., | ) | |
| | ) | Case Number: |
| | ) | |
| Plaintiff, | ) | Judge: |
| | ) | |
| v. | ) | Magistrate Judge: |
| | ) | |
| ANDREW MARQUIS, KEVIN | ) | |
| COCCOLUTO, PATRICK COLLINS, | ) | |
| JAMES ELLIS, TOM GIUSTI, and NICK | ) | |
| MARLIN, | ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND DEMAND FOR JURY TRIAL

Guaranteed Rate, Inc. ("GRI" or the "Company"), by and through its attorneys, brings this Complaint against Andrew Marquis ("Marquis"), Kevin Coccoluto ("Coccoluto"), Patrick Collins ("Collins"), James Ellis ("Ellis"), Tom Giusti ("Giusti"), and Nick Marlin ("Marlin") (collectively "Defendants"), and alleges as follows:

## NATURE OF THE CASE

1.      This action is brought on an expedited basis to stop Defendants from continuing to misappropriate highly confidential and proprietary information in order to divert millions of dollars of loans in process with GRI for their own benefit, as well as to stop Defendants from improperly soliciting GRI customers, referral sources, and employees in direct violation of the Defendants' contractual and legal obligations to GRI. Defendants are each former GRI employees who are now employed by CrossCountry Mortgage, LLC ("CrossCountry"), which is a direct competitor of GRI. In the span of less than 48 hours, 24 GRI employees, including Defendants, abruptly resigned from GRI and, shortly thereafter, moved to CrossCountry. In the days leading up to their departure, Defendants compiled vast amounts of GRI's highly confidential and

proprietary information and transmitted it to their personal email accounts. Defendants are now using the confidential information they pilfered to unfairly compete with GRI.

2.     The full extent of Defendants' unlawful conduct is presently unknown because Defendants have taken significant efforts to conceal their wrongdoing from GRI—including transmitting GRI's highly confidential and proprietary information to their personal email addresses on the very same day that they submitted their resignations, and using messages sent through social media platforms (e.g., LinkedIn) and other channels hidden from GRI to covertly poach current GRI employees. But, GRI has already uncovered substantial evidence of wrongdoing by these Defendants that has already harmed GRI and that will continue to cause irreparable harm unless Defendants are swiftly enjoined.

3.     Until recently, Marquis was Branch Manager and the Senior Loan Officer of GRI's Lexington, Massachusetts branch (the "Lexington Branch"). Coccoluto, Collins, Ellis, Giusti, and Marlin were each GRI employees who were part of the "Marquis Team" and served under and at the direction of Marquis in various capacities.

4.     On August 31 and September 1, 2021, Defendants and 18 other GRI employees suddenly announced their en masse resignations from GRI and then immediately joined CrossCountry. Shortly before tendering their near-simultaneous resignations to GRI (but while still employed by GRI), Defendants, at Marquis' direction, misappropriated a massive amount of GRI confidential and proprietary information in violation of their respective employment agreements and their fiduciary duties of loyalty and fidelity owed to GRI. This information included confidential customer information, including information of customers with pending mortgage applications, as well as GRI's confidential and highly valuable referral network of realtors, including contact information and customer referral history.

2

5.      In the weeks leading up to his departure from GRI, Marquis directed subordinates, including Coccoluto, Collins, Ellis, and Giusti, to secretly compile this confidential and proprietary information and transfer it to Defendants' personal Gmail accounts (for no legitimate business reason and in flagrant violation of GRI's email usage policy). In addition, on the day he resigned, Coccoluto sent copious amounts of highly confidential and proprietary loan and customer data to his personal Gmail account.

6.      Defendants are now using confidential information pilfered from GRI as part of a concerted effort to unfairly compete with GRI by soliciting customers and realtor referral partners in violation of their agreements with GRI. While the full extent of Defendants' wrongdoing is presently unknown, since Defendants' recent departure from GRI, at least 29 customers who submitted loan applications or otherwise engaged with GRI have moved to CrossCountry as a direct result of Defendants' misappropriation of confidential GRI information and improper solicitation of GRI customers and other unlawful conduct.

7.      In addition to Defendants' misappropriation of GRI confidential and proprietary information and improper solicitation of GRI customers and referral partners, Marquis has also violated, and continues to violate, his employee non-solicitation obligations in his employment agreement. As evidenced by the near-simultaneous departures of 23 GRI employees, who were all part of the "Marquis Team," Marquis recruited, coordinated, and facilitated the departure of these GRI employees while he was still employed and heavily compensated by GRI, in violation of his non-solicitation obligations and his fiduciary duty of loyalty to GRI. Moreover, since Marquis has joined CrossCountry, he has continued to violate his non-solicitation obligations to GRI.

8. Because Defendants have attempted to hide their unlawful conduct and because the irreparable injury to GRI is ongoing, expedited discovery is necessary to reveal: the full nature and extent of Defendants' scheme to steal; their actual theft of, valuable GRI confidential and proprietary information; their improper solicitations of GRI customers, referral partners, and employees; and other violations of law described herein.

## PARTIES

9. GRI is a corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 3940 North Ravenswood Avenue in Chicago, Illinois. GRI is a citizen of the State of Illinois. GRI is in the business of originating, closing, and selling mortgage loans and related products, and is one of the leading mortgage lenders in the United States.

10. Marquis is an individual who resides in Concord, Massachusetts. Marquis is a citizen of the State of Massachusetts. Marquis and GRI executed the Vice President of Mortgage Lending Compensation Terms on October 5, 2015 ("Marquis Agreement," attached hereto as Exhibit A). Marquis also executed the Guaranteed Rate, Inc. Equity Incentive Plan Non-Qualified Stock Option Award Agreement on June 25, 2018 ("Option Award," attached hereto as Exhibit B), which expressly incorporated the Guaranteed Rate, Inc. Equity Incentive Plan ("Equity Incentive Plan," attached hereto as Exhibit C). For ease of reference, the Option Award and Equity Incentive Plan are referred to collectively as the "Marquis Stock Agreement."

11. Coccoluto is an individual who resides in Lynn, Massachusetts. Coccoluto is a citizen of the State of Massachusetts. Coccoluto and GRI executed the Sales Compensation Plan & Agreement on June 23, 2021 ("Cocculoto Agreement," attached hereto as Exhibit D).

12. Collins is an individual who resides in Stoneham, Massachusetts. Collins is a citizen of the State of Massachusetts. Collins and GRI executed the Retail Sales Assistant Agreement on January 14, 2019 ("Collins Agreement," attached hereto as Exhibit E).

13. Ellis is an individual who resides in Brighton, Massachusetts. Ellis is a citizen of the State of Massachusetts. Ellis and GRI executed the Business Development Manager Compensation Plan and Agreement on January 11, 2019 ("Ellis Agreement," attached hereto as Exhibit F).

14. Giusti is an individual who resides in Hudson, Massachusetts. Giusti is a citizen of the State of Massachusetts. Giusti and GRI executed the Sales Assistant Compensation Plan and Agreement on September 26, 2019 ("Giusti Agreement," attached hereto as Exhibit G).

15. Marlin is an individual who resides in Arlington, Massachusetts. Marlin is a citizen of the State of Massachusetts. Marlin and GRI executed the Production Manager Compensation Plan & Agreement on January 21, 2019 ("Marlin Agreement," attached hereto as Exhibit H).

## JURISDICTION AND VENUE

16. Subject matter jurisdiction is satisfied, pursuant to 28 U.S.C. § 1332(a)(1), as this is a civil action between parties of diverse citizenship and the amount in controversy exceeds $75,000.

17. Venue is also proper under 28 U.S.C. § 1391 because much of the wrongdoing and the harms associated with that wrongdoing occurred in this judicial district.

18. Defendants also each consented to the jurisdiction of and venue in the federal court in Cook County, Illinois, for the purposes of actions arising out of their employment and their respective employment agreements. *See* Ex. A, Marquis Agreement at Section VIII, at 11; Ex. C, Marquis Equity Incentive Plan at Article VIII (8.11), at 24; Ex. D, Coccoluto Agreement at Section

X, at 14; Ex. E, Collins Agreement at Section VIII, at 13; Ex. F, Ellis Agreement at Section VIII, at 8-9; Ex. G, Giusti Agreement at Section VIII, at 8; and Ex. H, Marlin Agreement at Section VIII, at 13.

## BACKGROUND FACTS

### GRI's Business & Employment of Defendants

19.     GRI is a residential mortgage lender and is licensed to do business in every state. GRI employs loan officers across the country to offer residential mortgage loans to consumers. GRI is one of the top five retail mortgage lenders in the United States, and GRI and its affiliated companies funded more than $73 billion in loans in 2020.

20.     GRI has achieved success in the industry by establishing a strong reputation for hiring and training employees who provide valuable services to customers and prospective customers and cultivating substantial networks of realtors and other referral partners who refer customers to GRI.

21.     GRI equips its employees with the tools they need to provide excellent client service and close mortgage loans for customers and prospective customers.  GRI provides employees access to a trove of GRI confidential and proprietary information, cutting-edge technology, and other resources.  GRI expends substantial amounts of money, time, and resources in developing, cultivating, and protecting this highly confidential information used to develop its customer and referral relationships and to build goodwill.  GRI also equips its loan officers with a variety of marketing resources that enable them to grow GRI's customer base and referral networks.

### Andrew Marquis

22.     GRI hired Marquis as the Senior Loan Officer for the Lexington Branch in July

2015.

23.     As a condition of his employment, Marquis signed the Marquis Agreement on or around October 5, 2015.  Ex. A, Marquis Agreement at 12.

24.     As Senior Loan Officer of GRI's Lexington Branch, Marquis' duties included procuring customers for the sale of mortgage loans to be secured by residential real estate through direct customer contact.  He also assisted in recruiting top originators, strengthening the Lexington Branch operations, and managing the operations and employees of the Lexington Branch.

25.     Marquis was one of GRI's most trusted and, consequently, most highly compensated employees.  Marquis was paid millions of dollars in 2020 alone.  In June 2018, GRI awarded Marquis options to purchase 20,000 shares of GRI stock.  As a condition of receiving those options, Marquis signed the Option Award and agreed to GRI's Equity Incentive Plan.  Ex. B, Option Award at 1.

26.     Marquis served as Senior Loan Officer from July 2015 until he resigned from GRI on August 31, 2021, effective immediately.

27.     On September 1, 2021 (the day after he resigned from GRI), Marquis joined CrossCountry as Regional Vice President.

NICK MARLIN

28.     GRI hired Nick Marlin in July 2015 in the Lexington Branch, initially as a Retail Production Assistant.  Marlin was promoted to Production Manager in July 2018.

29.     Marlin worked at GRI's Lexington Branch from July 2015 until he resigned from GRI on August 31, 2021, effective immediately.

30.     As a condition of his employment as Production Manager, Marlin signed the Marlin Agreement on or around January 21, 2019.  Ex. H, Marlin Agreement at 16.

31.    As Production Manager, Marlin's duties included managing Marquis' pipeline of loans, taking operational ownership of Marquis' loan transactions, and managing the loan processing team to close the loans that were originated by the Marquis Team.

32.    On September 2, 2021 (two days after he resigned from GRI), Marlin joined CrossCountry.

JAMES ELLIS

33.    GRI hired James Ellis in January 2019 as a Business Development Manager in the Lexington Branch.

34.    Ellis served as Business Development Manager in the Lexington Branch from January 2019 until he resigned from GRI on August 31, 2021, effective immediately.

35.    As a condition of his employment as Business Development Manager, Ellis signed the Ellis Agreement on or around January 11, 2019.  Ex. F, Ellis Agreement at 10.

36.    As Business Development Manager, Ellis' duties included marketing, customer outreach, and cultivating and strengthening customer relationships and goodwill for the Lexington Branch.

37.    Ellis joined CrossCountry almost immediately after resigning from GRI.

PATRICK COLLINS

38.    GRI hired Patrick Collins in March 2018, initially as a Sales Assistant in the Lexington Branch.  On May 9, 2021, Collins' title was changed to Assistant Regional Closing Manager.

39.    Collins worked in GRI's Lexington Branch from January 2019 until he voluntarily resigned from GRI on August 31, 2021, effective immediately.

40.    As a condition of his employment at GRI, Collins signed the Collins Agreement on

or around January 14, 2019.  Ex. E, Collins Agreement at 16.

41.     As Assistant Regional Closing Manager, Collins' duties included developing and overseeing closing processes, training closers on the GRI system and closing process, and assisting Marquis with compliance issues.

42.     On September 2, 2021 (two days after he resigned from GRI), Collins joined CrossCountry as Sales Manager.

THOMAS GIUSTI

43.     GRI hired Thomas Giusti in September 2019 as a Sales Assistant in the Lexington Branch.

44.     As a condition of his employment as Sales Assistant, Giusti signed the Giusti Agreement on or around September 26, 2019.  Ex. G, Giusti Agreement at 9.

45.     As Sales Assistant, Giusti's duties included supporting and managing customer engagement activities, maintaining relationships with real estate agents, and communicating with customers.

46.     Giusti served as a Sales Assistant in the Lexington Branch from September 2019 until he resigned from GRI on August 31, 2021, effective immediately.

47.     Giusti joined CrossCountry almost immediately after resigning from GRI.

KEVIN COCCOLUTO

48.     GRI hired Kevin Coccoluto in June 2021 as a Licensed Sales Assistant in the Lexington Branch.

49.     As a condition of his employment as Licensed Sales Assistant, Coccoluto signed the Coccoluto Agreement on or around June 23, 2021.  Ex. D, Coccoluto Agreement at 16.

50.     As Licensed Sales Assistant, Coccoluto's duties included supporting and managing

customer engagement activities, maintaining relationships with real estate agents, and communicating with customers.

51.     Coccoluto served as a Licensed Sales Assistant in the Lexington Branch from June 2021 until he resigned from GRI on September 1, 2021, effective immediately.

52.     On September 9, 2021, Coccoluto joined CrossCountry as a Loan Officer.

### DEFENDANTS' CONTRACTUAL OBLIGATIONS TO GRI

#### CONFIDENTIALITY

53.     Pursuant to the terms of their agreements with GRI, Defendants were entrusted with GRI's confidential information ("Confidential Information"), which assisted them in building relationships with new customers and referral partners.  Ex. A, Marquis Agreement at Section IV, at 9-10; Ex. C, Marquis Equity Incentive Plan at Article VIII (8.1), at 20-21; Ex. E, Collins Agreement at Section V(a)-(b), 10-11; Ex. F, Ellis Agreement at Section V(a)-(b), at 6; Ex. G, Giusti Agreement at Section V(a)-(b), at 5; Ex. D, Coccoluto Agreement at V(a)-(b), at 10-11; Ex. H, Marlin Agreement at Section V(a)-(b), at 10-11.

54.     GRI granted Defendants access to detailed and highly confidential information concerning, among other things, (a) GRI's customers or potential customers and their loan agreements, (b) GRI's valuable networks of realtors upon whom GRI depends on as referral sources, and (c) GRI's employees, including employee compensation, top performing employees, hiring criteria, and training techniques.  All of this information was Confidential Information as defined by Defendants' Agreements with GRI.[1]  Ex. A, Marquis Agreement at Section IV, at 10-

---

[1] Under those Agreements, Confidential Information includes, but is not limited to, knowledge of GRI's top performing employees, hiring criteria, training techniques, pricing and cost structure, customer or potential customer identities, customer relationship histories, customer records, customer service matters, and customer preferences, among other information.  Ex. A, Marquis Agreement at Section IV, at 10-11; Ex. C, Marquis Equity Incentive Plan at Article VIII (8.1), at

11; Ex. C, Marquis Equity Incentive Plan at Article VIII (8.1), at 20-21; Ex. E, Collins Agreement at Section V(a), at 10-11; Ex. F, Ellis Agreement at Section V(a), at 6; Ex. G, Giusti Agreement at Section V(a), at 5; Ex. D. Coccoluto Agreement at V(a), at 10-11; Ex. H, Marlin Agreement at Section V(a), at 10-11.

55.     Defendants had access to such Confidential Information including the identities of customers and potential customers, and the non-public non-public personal and other sensitive information of those mortgage loan customers and potential customers, for whom the Marquis Team originated loans, prequalified, or otherwise had contact with while employed by GRI.

56.     GRI has invested significant time and money in curating, maintaining, and developing its Confidential Information. GRI has also undertaken considerable efforts to protect its Confidential Information. These efforts include, for example: delineation of roles and responsibilities of company personnel responsible for safeguarding and protecting business information, including an information security team; asset control and management, including information technology assets; asset control and user access management, including delineating access rights to information systems and administering user ID, user passwords, and use of encryption (including multi-factor authentication); and communication security, including firewalls and email filtering.

57.     In addition, GRI has written policies provided to every employee and available on the Company intranet, with which every employee is expected to be familiar and comply. Those written policies include extensive provisions designed to protect GRI Confidential Information. Among other things, these policies strictly prohibit employees from using their personal email

---

20-21; Ex. E, Collins Agreement at Section V(a), at 10-11; Ex. F, Ellis Agreement at Section V(a), at 6; Ex. G, Giusti Agreement at Section V(a), at 5; Ex. D, Coccoluto Agreement at V(a), at 10-11; Ex. H, Marlin Agreement at Section V(a), at 10-11.

accounts to access Confidential Information or conduct GRI business. GRI also requires employees to sign agreements (like the Marquis, Marlin, Collins, Ellis, Giusti, and Coccoluto Agreements and Marquis Stock Agreement) that prohibit the misuse of such Confidential Information.

58. Each of Defendants' Agreements included provisions prohibiting the unauthorized use or disclosure of GRI Confidential Information (such provisions are collectively referred to herein as the "Confidential Information Provisions").

59. The Marquis Agreement Confidential Information Provision provides that, in consideration of his employment, Marquis "will not use this Confidential Information for [his] own benefit, or divulge or use the Confidential Information for the benefit of any competitor or customer, or any other person, firm, corporation, or other entity." Ex. A, Marquis Agreement at Section IV, at 9-10. It further provides that Marquis "shall not seek or accept any Confidential Information from any former, present, or future employee of GRI." *Id.*

60. The other Defendants' Agreements and the Marquis Stock Agreement provide substantially similar restrictions on the use of Confidential Information. *See* Ex. C, Marquis Equity Incentive Plan at Article VIII (8.1), at 20-21; Ex. E, Collins Agreement at Section V(b), at 11; Ex. F, Ellis Agreement at Section V(b), at 6; Ex. G, Giusti Agreement at Section V(b), at 5; Ex. D, Coccoluto Agreement at V(b), at 11; Ex. H, Marlin Agreement at Section V(b), at 11.

61. Moreover, each of the Defendants' Agreements with GRI expressly state that "Confidential Information" includes the identities of customers for whom "you originated loans" while at GRI. *See* Ex. A, Marquis Agreement at Section IV, 10; Ex. C, Marquis Equity Incentive Plan at Article VIII (8.1), at 20-21; Ex. E, Collins Agreement at Section V(b), at 11; Ex. F, Ellis Agreement at Section V(b), at 6; Ex. G, Giusti Agreement at Section V(b), at 5; Ex. D, Coccoluto

Agreement at V(b), at 11; Ex. H, Marlin Agreement at Section V(b), at 11. The Confidential Information Provisions also expressly state that Defendants may not solicit customers who have "submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for [the GRI employee's] actions or omissions" or have "a loan in process with the Company at that time, or would have had a loan in process with the Company but for [the GRI employee's] act or omissions." Ex. A, Marquis Agreement at Section IV, at 10; Ex. E, Collins Agreement at Section V(b), at 11; Ex. F, Ellis Agreement at Section V(b), at 6; Ex. G, Giusti Agreement at Section V(b), at 5; Ex. D, Coccoluto Agreement at V(b), at 11; Ex. H, Marlin Agreement at Section V(b), at 11.

NON-SOLICITATION OF GRI EMPLOYEES

62. The Marquis Agreement also includes a "Non-Solicitation" provision, which sets forth specific and unambiguous restrictions on the solicitation of GRI employees. In its entirety, this section in the Marquis Agreement states:

**(i)    Employees**

In consideration for your employment, you agree that during your employment and for twenty-four (24) months after your employment, you will not, directly or indirectly, hire, solicit or encourage any GRI employee (defined as anyone employed by GRI during your last 12 months of employment with GRI or in the 24 months after your employment) to end their employment with GRI and/or join you as a partner, agent, employee, or otherwise in a business venture or other relationship. You also agree that, during this same period, you will not supervise, manage, or oversee the work of any former GRI employee you learned of during your employment with GRI. You may obtain written consent from GRI to solicit or supervise a GRI employee or former GRI employee if GRI is not interested in retaining that employee, but such request must be made in writing and granted before you can solicit such employee.

If you breach this Non-Solicitation Section, you agree that you shall be liable for, and agree to pay *Fifty Thousand Dollars ($50,000.00) as liquidated damages for each employee solicited* (in addition to any other reimbursements owed by Employee due to other breaches of Employee). The parties agree that this is fair and equitable consideration for Employee's breach of this covenant and is not a penalty. Additionally, if you breach your non-solicitation obligations, the 24-month

> period described above will be extended as though it begins on the last date of such breach. You agree that in any action to enforce, defend and/or prosecute any of the terms of this Section, you will be responsible for GRI's attorney's fees and costs related to such action.

Ex. A, Marquis Agreement at Section V(a), at 10 (emphasis in original).

63.     The other Defendants' Agreements contain substantially similar restrictions on the solicitation of GRI employees.  *See* Ex. H, Marlin Agreement at Section V(d)(i), at 11-12; Ex. C, Marquis Equity Incentive Plan at Article VIII (8.4(a)), at 22; Ex. D, Coccoluto Agreement at Section V(d)(1), at 11-12; Ex. G, Giusti Agreement at Section V(d)(i), at 6; Ex. F, Ellis Agreement at Section V(e)(i), at 7; Ex. E, Collins Agreement at Section V(d)(i), at 11-12 (collectively, "Employee Non-Solicitation Provisions").

NON-SOLICITATION OF CUSTOMERS

64.     The Marquis Stock Agreement also sets forth express restrictive covenants that prohibit the solicitation of customers who had submitted loan applications with GRI.  Marquis' Stock Agreement provides:

> During the Non-Solicitation Period, Participant shall not, and shall not cause his, her or its affiliates to, directly or indirectly on his, her or its own behalf or on behalf of any third party call on, solicit, attempt to solicit, provide any services to, or become engaged or employed by any customer, supplier, lender, licensee, licensor, payor, referral source, shareholder, or other person that has a business relationship with the Company or any of its Subsidiaries (each a "Company Counterparty") for the purpose of providing goods or services to such Company Counterparty that the Company and/or its Subsidiaries offer or provide or have taken material steps towards offering or providing, inducing or attempting to induce any Company Counterparty to cease or reduce doing business with the Company or its Subsidiaries, or in any way interfering with or harming the relationship between the Company Counterparty, on the one hand, and the Company or its Subsidiaries, on the other hand.  The provisions of this Section 8.4(b), however, will not apply to any Participant to the extent that entering into any such restriction would be illegal under applicable local law.

Ex. C, Marquis Equity Incentive Plan at Article VIII (8.4(b)), at 22 (hereinafter "Customer Non-Solicitation Provision").

NON-SOLICITATION OF GRI REFERRAL PARTNERS

65.     Each of the Defendants' Agreements prohibit solicitation of vendors and referral partners, which includes realtors who refer clients to GRI. Defendant Marquis' Agreement provides:

> In consideration for your employment, you agree that for twenty-four (24) months following your termination, you will not, for yourself or on behalf of any other person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of GRI whom you learned of or became acquainted with during your employment with GRI – this restriction does not apply to your relationships that pre-date your employment with GRI.

Ex. A, Marquis Agreement at Section V(b), at 10.

66.     Marquis' Stock Agreement and the other Defendants' Agreements contain substantially similar restrictions. *See* Ex. H, Marlin Agreement at Section V(d)(ii), at 12; Ex. C, Marquis Equity Incentive Plan at Article VIII (8.4(b)), at 22; Ex. D, Coccoluto Agreement at Section V(d)(2), at 12; Ex. G, Giusti Agreement at Section V(d)(ii), at 6; Ex. F, Ellis Agreement at Section V(e)(ii), at 7; Ex. E, Collins Agreement at Section V(d)(ii), at 12 (collectively, "Referral Partner Non-Solicitation Provisions").

**THE MARQUIS TEAM PILFERS VALUABLE CONFIDENTIAL INFORMATION SHORTLY BEFORE RESIGNING FROM GRI**

67.     In the days leading up to their near-simultaneous resignations from GRI on August 31 and September 1, the Marquis Team stole and misappropriated a treasure trove of GRI Confidential Information in violation of their contractual agreements with, and fiduciary duties to, GRI. More specifically, the Marquis Team, including at least Ellis, Collins, Giusti, and Coccoluto, at the direction of Marquis, compiled and misappropriated large volumes of GRI Confidential Information pertaining to GRI's referral partners, customers, and potential customers.

68.     Defendants' actions in the time since they resigned from GRI have made clear the

intent of their large-scale theft: to use GRI Confidential Information to divert GRI's customers, prospective customers, and referral partners to GRI's competitor, CrossCountry.

69.     The full scope of Defendants' theft of GRI's Confidential Information is unknown at present because Marquis and his team took pains to conceal their efforts from GRI.  In some cases, however, Defendants slipped up, and GRI was able to obtain snapshots of their flagrant contractual and other legal violations.

70.     For example, on August 3, 2021 (less than a month before his resignation), Marquis asked Ellis (copying Collins and Coccoluto) to help him create "a list of all purchase deals/realtors from July" that closed with GRI so "[w]e can then screen for the 'good ones' to begin our outreach."  Ex. I, Marquis Email Chain at 8 (Marquis Aug. 3, 2021 11:54 AM Email).

71.     On August 12, Ellis replied to Marquis (copying Collins and Coccoluto) stating that he had created the list "of all agents we worked with in July," which he had "shared . . . in a [G]oogle shared document, which everyone should be able to access."  Ellis indicated that he had "already reached out to some of the agents" on the list.  Ex.I, Marquis Email Chain at 7 (Ellis Aug. 12, 2021 2:43 PM Email).  Marquis then forwarded Ellis' email to his team at GRI directing them to "review/advise so we can attack all agents on this list." Ex. I, Marquis Email Chain at 6 (Marquis Aug. 12, 2021 4:42 PM Email).

72.     On August 13, Collins asked Ellis to update the realtor list to "include the property address of the file that closed and/or the loan number," which Ellis agreed to do.  Ex. I, Marquis Email Chain at 3-4 (Collins Aug. 13, 2021 11:11 AM Email; Ellis Aug. 13, 2021 11:13 AM Email).

73.     As shown by the illicit efforts of Marquis, Collins, Ellis, and Giusti, the list requested by Marquis and Collins and distributed and/or shared by Ellis and Giusti contained valuable GRI Confidential Information because it included information not available to the general

public or GRI's competitors (including CrossCountry) identifying the network of realtors from whom Marquis and his team had received referrals by GRI, and using GRI's resources, as well as detailed information regarding the history of GRI loans to customers referred by these realtors. This referral network constitutes GRI Confidential Information because GRI enabled its employees to collect and cultivate this network, using tools and resources GRI had made available to them. This information can provide competitors with an instant network of referral sources that can be used immediately for marketing purposes, without having to invest the time, money, and effort to build it.

74.     GRI has uncovered evidence that, shortly before the Marquis Team departed for CrossCountry, Defendants transferred GRI's Confidential Information to their personal Gmail accounts. For example, on August 12, 2021, Marquis requested access to the realtor list Ellis had compiled using Marquis' personal Gmail account. Ex. J, Marquis Google Sheets Share Request at X (Aug. 12, 2021 1:41 PM Email). Similarly, on August 13, 2021, Ellis directed Giusti to send the realtor list to Ellis' personal Gmail account. Ex. I, Marquis Email Chain at 1 (Ellis Aug. 13, 2021 11:19 AM Email).

75.     Defendants had no legitimate reason to transfer GRI Confidential Information to their personal email accounts instead of using their GRI email accounts to access that information.

76.     Indeed, Defendants' transfer violated GRI Company Policy of using personal email accounts to access GRI Confidential Information. *See* Ex. K, Private and Shared Email Addresses Policy, as of August 2021 ("***Personal email accounts are never permitted to conduct Guaranteed Rate business***" (emphasis in original)).

77.     Also, on September 1, 2021 (the same day Coccoluto resigned from GRI), Coccoluto used his GRI email account to send two spreadsheets to his personal Gmail account, in

clear violation of GRI policy. Ex. L, Coccoluto Sept. 1, 2021 6:35 AM Email at 1[2]. Those two spreadsheets included: (1) a document with the file name "Lead+Sales Tracker.xlsx," containing the identities and contact information for several GRI customers or potential customers, the status of their relationship with GRI, and the source of who referred those customers to GRI, and (2) a document with the file name "Buyer-Leads-Sabrina.csv," containing the identities of over 300 GRI customers or potential customers that had been referred to GRI through a realtor.

78. The information reflected on the spreadsheets Coccoluto sent to his personal email account the day he resigned from GRI was Confidential Information because it showed the identity of GRI's current or potential clients, including those individual's property addresses and other loan information, as well as the referral source for those clients.

79. As demonstrated by their conduct since joining CrossCountry (described below), Defendants' intent in compiling, transferring, and distributing Confidential Information just before their departure from GRI was to divert a significant portion of GRI's referral network and existing customers to CrossCountry in flagrant violation of their contractual and other legal obligations to GRI.

**MARQUIS AND HIS TEAM USE STOLEN GRI CONFIDENTIAL INFORMATION TO DIVERT GRI'S CUSTOMERS TO CROSSCOUNTRY**

80. Since leaving GRI and joining CrossCountry, Marquis and the other Defendants have used Confidential Information stolen from GRI to divert GRI's customers to CrossCountry.

81. The full extent of Defendants' diversion of customers to CrossCountry is not yet known because of Defendants' efforts to conceal their wrongdoing from GRI. However, GRI has already uncovered multiple instances of the Defendants' improper solicitations of GRI customers.

---

[2] The metadata for this email shows it was sent from kevin.coccoluto@rate.com to kevincoccoluto@gmail.com.

82.     Since Marquis' resignation from GRI on August 31, at least 29 customers have cancelled their loan applications or otherwise withdrawn from their loan processes with GRI in order to pursue loans with CrossCountry instead.

83.     Many of these clients have informed GRI that they cancelled their loan applications with GRI because members of Marquis' team at CrossCountry, including at least Marquis, Collins, and Marlin, have contacted them directly and used GRI Confidential Information, including information submitted to GRI by those customers and GRI's pricing and loan terms, to divert those loans to CrossCountry.  By way of example:

- On Tuesday, August 31 (the same day he resigned from GRI), Collins used his GRI account to email two customers who had submitted an application with GRI asking for a call to discuss the customers' loan terms.  Two days later, on Thursday September 2, the customers informed GRI that they had "decided not to proceed with Guaranteed Rate."

- On September 7, a customer who had a refinancing application in process with GRI informed GRI that Marlin had solicited him to transfer his application to CrossCountry.  The customer indicated that Marlin was armed with GRI's confidential rate information and was prepared to undercut it by 0.125%.

- On September 9, customers who had a loan application pending informed GRI that they were cancelling their account because Marquis had reached out to them and convinced them to switch to CrossCountry.

84.     Marquis', Collins', and Marlin's diversion of GRI's customers to CrossCountry is a flagrant violation of their obligations to GRI, creating ongoing harm to GRI.

85.     The identities of these GRI clients, their contact information, rate terms, loan

conditions, and related information were all Confidential Information which Marquis, Collins, and Marlin were privy to while employed by GRI, using GRI's resources. Marquis, Collins, and Marlin each misused that Confidential Information to divert clients to CrossCountry.

86.     Marquis' diversion of customers who had already submitted loan applications to GRI is also a clear violation of the Customer Non-Solicitation Provision of the Marquis Stock Agreement. Marquis also violated the Customer Non-Solicitation Provision by directing members of his team, including at least Collins and Marlin, to divert such customers to CrossCountry.

87.     GRI has reason to believe, and alleges on information and belief, that Defendants intentionally delayed the loan process for potential new customers at GRI in order to cause those customers to start their applications initially at CrossCountry, thereby diverting potential customers from working with GRI, all while Defendants were still employed at GRI.

88.     Based on these glaring breaches of their confidentiality and non-solicitation duties, GRI has reason to believe that Marquis, Collins, Marlin, and other members of Marquis' team at GRI will continue violating their contractual obligations to GRI unless enjoined.

**MARQUIS IMPROPERLY SOLICITS GRI'S EMPLOYEES**

89.     In addition to Marquis, Marlin, Ellis, Collins, Giusti, and Coccoluto, 18 other GRI employees who worked under Marquis voluntarily resigned from GRI on or around the same day as Marquis and promptly joined Marquis' team at Cross Country. These employees are:

- Christopher Collins, a Loan Coordinator;

- Desirae Day, a Closing Coordinator;

- Anthony DeRiggi, an Operations Assistant;

- Kayla Fogarty, a Mortgage Consultant;

- Anna Garay, a Loan Coordinator;

- Michael Hackett, a Licensed Sales Assistant;

- Julie Hamilton, a Mortgage Consultant;

- Coulter Heinz, a Closing Coordinator;

- Maria Hernandez (Rodriguez), an Operations Manager;

- Zorica Jovanovic, a Production Manager;

- Brendan Minich, a Licensed Sales Assistant;

- Andy Minier, an Operations Assistant;

- Martin Murdock, a Mortgage Consultant;

- Roy Palumbo, an Operations Assistant;

- Julia Petrillo, a Business Development Coordinator;

- Leanne Poole, a Mortgage Consultant; and

- Maridsa Santana, a Loan Coordinator.[3]

90. Each of these employees resigned from GRI on August 31, 2021, with the exception of Zorica Jovanovic and Julia Petrillo, who resigned a day later on September 1, 2021.

91. The only plausible explanation for the near-simultaneous timing of Marquis and *23 members* of his GRI team is that Marquis—who was the leader of the "Marquis Team" and one of the largest loan originators in the country—orchestrated it all. GRI believes and avers that Marquis improperly solicited each of these employees to leave GRI and join him working for CrossCountry, and that he did so while still employed by GRI, breaching his fiduciary duties of loyalty and fidelity to GRI.

---

[3] GRI's investigation is ongoing and has been hampered by Defendants' intentional efforts to hide their wrongdoing from GRI. GRI expressly reserves the right to amend its Complaint to add additional Defendants.

92.     Since joining CrossCountry, Marquis' efforts to poach current GRI employees has continued unabated. GRI is aware of other current employees who have received aggressive offers to join CrossCountry from Marquis via telephone calls and through covert messaging sent through social media platforms such as LinkedIn. Marquis never requested or received GRI's permission to solicit any GRI employee to leave GRI's employment or to join CrossCountry. The recruitment of these employees thus constitutes a blatant violation of the Non-Solicitation provisions in the Marquis Agreement. Marquis also breached his fiduciary duties of loyalty and fidelity to GRI by improperly soliciting GRI employees *while still employed by GRI.*

93.     Based on his flagrant violations of his non-solicitation obligations, GRI has reason to believe that Marquis will continue his campaign to improperly attempt to poach GRI employees unless enjoined.

## GRI'S RIGHT TO INJUNCTIVE RELIEF

94.     Defendants have materially breached their respective Agreements and fiduciary duties to GRI, committed other violations of law, and are likely to continue to do so unless enjoined as requested herein. These breaches and other violations of law have and will continue to result in substantial, irreparable, and foreseeable harm to GRI for which there is no adequate remedy at law. Such harm includes, but is not limited to, wrongful use of GRI's Confidential Information, impairment of the value of such information, loss of customer and prospective customer relationships, and impairment of GRI's business relationships and GRI goodwill.

95.     Defendants' actions since joining GRI's direct competitor demonstrate that they are continuing to use the Confidential Information they stole to their advantage and continue to breach the Confidential Information Provisions in their respective Agreements and commit other violations of law. Thus, without the preliminary and permanent injunctive relief requested herein,

GRI will continue to suffer substantial and irreparable harm for which there is no adequate remedy at law.

96.     GRI has a substantial likelihood of success on the merits of its claims.

97.     The threat of harm to GRI in the absence of injunctive relief as requested herein far outweighs the threat of any harm to Defendants if injunctive relief is granted.  As noted above, GRI faces substantial and irreparable harm if Defendants' breaches and violations of law are permitted to continue unabated.  In contrast, there is no hardship imposed on Defendants, who remain free to work for CrossCountry, but without the unfair competitive aid of stolen GRI Confidential Information and improper solicitation of GRI customers and employees.  Defendants' only burden is to comply with the law and their respective Agreements, compete fairly and lawfully in the market, and refrain from reaping any illicit gain or benefit from the breach of their contractual obligations to GRI.

98.     The public interest favors preventing Defendants from reaping illicit gains by breaching their contractual obligations to GRI and committing other violations of law, including, among other things, by using GRI's Confidential Information for their own benefit and the benefit of their new employer.

## CLAIMS

### COUNT I – BREACH OF CONTRACT (CONFIDENTIAL INFORMATION)
### (Against All Defendants)

99.     GRI incorporates and re-alleges Paragraphs 1 through 98 as if fully set forth herein.

100.    The Marquis Agreement, the Marquis Stock Agreement, the Coccoluto Agreement, the Collins Agreement, the Ellis Agreement, the Giusti Agreement, and the Marlin Agreement are valid and enforceable contracts that impose upon the Defendants certain contractual obligations and restrictive covenants, including the Confidential Information Provisions.

101.    GRI has performed all of its obligations under the Marquis Agreement, the Marquis Stock Agreement, the Coccoluto Agreement, the Collins Agreement, the Ellis Agreement, the Giusti Agreement, and the Marlin Agreement or those obligations are excused under the circumstances.

102.    Pursuant to the Confidential Information Provisions in Defendants' respective Agreements, Defendants were and are prohibited from seeking, accepting, providing, disclosing, or using for their own benefit GRI Confidential Information. Confidential Information includes, but is not limited to, customer or potential customer identities, customer records and relationship histories, including those customers' financial information and available rates, customer service matters, and customer preferences, among other information.

103.    As former GRI employees, the Confidential Information Provisions further prohibit Defendants from using GRI Confidential Information to solicit GRI customers or potential customers who had submitted a loan application to GRI or would have submitted a loan application but for Defendants' actions.

104.    As discussed above, Marquis requested and received massive amounts of GRI Confidential Information prior to resigning from Coccoluto, Ellis, and Giusti. Marquis, Ellis, Giusti, and Coccoluto transferred this substantial GRI Confidential Information from their GRI email addresses to their personal email accounts. Defendants had no legitimate business reason to transfer this Confidential Information to their personal email accounts, and, in fact, Defendants were prohibited from doing so under GRI Policy. Such actions are clear breaches of the Confidential Information Provisions in the Marquis, Coccoluto, Ellis, and Giusti Agreements.

105.    Since joining CrossCountry, Marquis, Collins, and Marlin have each used GRI Confidential Information to successfully solicit GRI customers to divert their loan applications to

CrossCountry. As noted above, Defendants have already convinced at least 29 customers to move from GRI to CrossCountry. These actions are clear breaches of the Confidential Information Provisions in the Marquis, Collins, and Marlin Agreements. As a result of this conduct, GRI has suffered irreparable harm for which there is no adequate remedy at law. Such irreparable harm will continue unless Defendants are enjoined as requested below in the Prayer for Relief.

## COUNT II – BREACH OF CONTRACT (NON-SOLICITATION OF EMPLOYEES)
### (Against Marquis)

106. GRI incorporates and re-alleges Paragraphs 1 through 105 as if fully set forth herein.

107. The Marquis Agreement and Marquis Stock Agreement are valid and enforceable contracts between Marquis and GRI.

108. GRI has performed all of its obligations under the Marquis Agreement and Marquis Stock Agreement or those obligations are excused under the circumstances.

109. Pursuant to the terms of the Marquis Agreements, during the course of Marquis' employment and for 24 months thereafter, Marquis could not and cannot directly or indirectly hire, solicit, or encourage any person employed by GRI during the restricted period to end their employment with GRI.

110. Pursuant to the explicit terms of the Agreement, in the event Marquis breaches his non-solicitation obligations, he shall be liable to GRI for each employee solicited in the amount of Fifty Thousand Dollars ($50,000) as liquidated damages.

111. As alleged above, Marquis breached the Employee Non-Solicitation Provisions of his Agreements *while he was still employed by GRI* by successfully soliciting at least 22 GRI employees from the Marquis Team to leave the Guaranteed Rate and join CrossCountry with him. As noted above, each of these individuals resigned on or near the same date that Marquis resigned

25

and all of these individuals joined CrossCountry at or around the same time as Marquis. Given the number of employees supervised by Marquis and the timing of their resignations, Marquis solicited his team members to depart GRI with him and coordinated those resignations, all while he was employed by GRI.

112. Further, since joining CrossCountry, Marquis has continued to breach the Employee Non-Solicitation Provisions by personally soliciting more current GRI employees. As a result of this conduct, GRI has suffered irreparable harm for which there is no adequate remedy at law. Such irreparable harm will continue unless Marquis is enjoined as requested below in the Prayer for Relief.

## COUNT III – BREACH OF CONTRACT (NON-SOLICITATION OF CUSTOMERS)
### (Against Marquis)

113. GRI incorporates and re-alleges Paragraphs 1 through 112 as if fully set forth herein.

114. The Marquis Stock Agreement is a valid and enforceable contract that imposes upon Marquis certain contractual obligations and restrictive covenants, including the Customer Non-Solicitation Provision.

115. GRI has performed all of its obligations under the Marquis Stock Agreement or those obligations are excused under the circumstances.

116. Pursuant to the explicit terms of the Marquis Stock Agreement, during the course of Marquis' employment and for 24 months thereafter, he could not and cannot directly or indirectly solicit, attempt to solicit, direct any members of his team to solicit, provide any services to, or become engaged or employed by any customer with a business relationship with GRI for the purposes of providing services GRI offers or to induce customers to cease or reduce business with GRI.

26

117. As alleged above, Marquis breached and continues to breach the Customer Non-Solicitation Provisions of his Stock Agreement by soliciting and directing members of his team to solicit (including at least Collins and Marlin) customers who had submitted loan applications to GRI to cancel their GRI loan applications and instead apply with CrossCountry.

118. As a result of this conduct, GRI has suffered irreparable harm for which there is no adequate remedy at law. Such irreparable harm will continue unless Marquis is enjoined as requested below in the Prayer for Relief.

## COUNT IV – BREACH OF CONTRACT (NON-SOLICITATION OF REFERRAL PARTNERS)
### (Against Marquis, Ellis, and Giusti)

119. GRI incorporates and re-alleges Paragraphs 1 through 118 as if fully set forth herein.

120. The Marquis, Ellis, and Giusti Agreements and the Marquis Stock Agreement are valid and enforceable contracts that impose upon Marquis, Ellis, and Giusti certain contractual obligations and restrictive covenants, including the Referral Partner Non-Solicitation Provisions.

121. GRI has performed all of its obligations under the Agreements or those obligations are excused under the circumstances.

122. Pursuant to the explicit terms of the Marquis, Ellis, and Giusti Agreements and the Marquis Stock Agreement, during the course of Marquis', Ellis', and Giuisti's employment and for 24 months thereafter, they could not and cannot directly or indirectly solicit, offer or provide services to, or seek services from, any past or present referral partner of GRI whom they learned of or became acquainted with during their employment with GRI.

123. As alleged above, Marquis, Ellis, and Giusti breached the Referral Partner Non-Solicitation Provisions of their Agreements by collecting and distributing lists of GRI's realtor

referral partners shortly before leaving GRI, and then soliciting those realtors to refer customers to Marquis and his team at CrossCountry instead of GRI.

124. As a result of this conduct, GRI has suffered irreparable harm for which there is no adequate remedy at law. Such irreparable harm will continue unless Marquis, Ellis, and Giusti are enjoined as requested below in the Prayer for Relief.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

125. GRI incorporates and re-alleges Paragraphs 1 through 124 as if fully set forth herein.

126. At all relevant times prior to their resignations from GRI, Defendants were employees of GRI.

127. At all relevant times prior to their resignations from GRI, Defendants owed to GRI fiduciary duties of trust, loyalty, full disclosure, and good faith with respect to all matters within the scope of their agency.

128. In breach of their fiduciary duties, Defendants engaged in the misappropriation of GRI Confidential Information. Their breaches of their fiduciary duties were willful, as evidenced by their calculated actions over the course of days and weeks leading up to their resignations from GRI, including the mass transfer of GRI Confidential Information to certain Defendants' personal email accounts, as well as Defendants' solicitation of GRI's realtor referral partners to refer loans to CrossCountry instead of GRI.

129. In further breach of his fiduciary duties, GRI believes that Marquis, while still employed by GRI, solicited at least 23 employees, to terminate their employment with GRI and to join CrossCountry. Marquis' breach of his fiduciary duties by improperly soliciting GRI's employees *while still employed by GRI* was willful, as evidenced by his calculated actions in

soliciting such individuals to resign almost immediately after he did so, and his continued, aggressive attempts to personally recruit current GRI employees to join CrossCountry.

130.    As a direct, proximate, and foreseeable result of Defendants' breaches of their fiduciary duties, GRI has suffered and, unless Defendants are enjoined as requested herein, will continue to suffer substantial and irreparable harm for which there is no adequate remedy at law. This harm includes, but is not limited to, wrongful use of GRI's Confidential Information, impairment of the value of such information, impairment of GRI's business relationships and customer goodwill, and impairment of GRI's relationships with its customers, employees, and referral partners.

131.    GRI has a substantial likelihood of success on the merits of this claim due to Defendants' overt actions in the days and weeks leading up to their resignations to misappropriate GRI Confidential Information, Marquis' actions to solicit his subordinate employees, and Marquis, Ellis and Giusti's actions to solicit GRI referral partners.

132.    The threat of harm to GRI in the absence of injunctive relief as requested far outweighs the threat of any harm to Defendants if an injunction is granted. GRI faces irreparable harm to its customer and employee relationships. There is no hardship imposed on Defendants. Defendants' only burden is to comply with the law, compete fairly and lawfully in the market, and refrain from reaping any illicit gain or benefit from their unlawful and unfair conduct.

133.    The public interest favors preventing Defendants from reaping illicit gains by breaching their fiduciary duties to GRI, including by utilizing GRI's Confidential Information for their own benefit—and for CrossCountry's benefit—and by soliciting GRI's valued employees to leave GRI employment to join one of GRI's direct competitors.

## COUNT VI – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against Marquis, Collins, and Marlin)

134.    GRI incorporates and re-alleges Paragraphs 1 through 133 as if fully set forth herein.

135.    GRI has a valid business relationship with its existing and potential customers.

136.    Marquis, Collins, and Marlin were aware of these business relationships, but nonetheless intentionally or unjustifiably diverted customers from GRI to CrossCountry using GRI Confidential Information regarding those customers' identities and loan terms to which they had access only by virtue of their employment with GRI.

137.    As a direct, proximate, and foreseeable result of Marquis', Collins', and Marlin's tortious interference, GRI has suffered and, unless Defendants are enjoined as requested herein, will continue to suffer substantial and irreparable harm for which there is no adequate remedy at law.  Such harms include, but are not limited to, wrongful use of GRI's Confidential Information, impairment of the value of such information, and impairment of GRI's business relationships and customer goodwill.

138.    GRI has a substantial likelihood of success on the merits of this claim due to Marquis', Collins', and Marlin's knowledge of GRI's business relationships and their intentional and unjustified interference with those relationships.

139.    The threat of harm to GRI in the absence of injunctive relief as requested herein far outweighs the threat of any harm to Defendants if injunctive relief is granted.  GRI faces irreparable harm in the form of loss of customer goodwill and relationships.  In contrast, there is no hardship imposed on Defendants.  Defendants' only burden is to comply with the law and their respective Agreements, compete fairly and lawfully in the market, and refrain from reaping any

illicit gain or benefit from the breach of their unlawful, unfair, and tortious conduct toward GRI.

140.     The public interest favors preventing Defendants from reaping illicit gains by tortiously interfering with GRI's business relationships, including by diverting customers from GRI to CrossCountry, one of GRI's direct competitors, and soliciting GRI's current employees to leave GRI for CrossCounty.

## COUNT VII – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Marquis)

141.     GRI incorporates and re-alleges Paragraphs 1 through 140 as if fully set forth herein.

142.     GRI has valid and enforceable Agreements with its existing employees.  Each of these Agreements contains Confidential Information Provisions, which prohibit GRI employees from seeking, accepting, providing, disclosing, or using for their own benefit GRI Confidential Information.

143.     Marquis was aware of these employment Agreements and, in particular, the Confidential Information Provisions, but nonetheless intentionally or unjustifiably induced Defendants Ellis, Marlin, Collins, Giusti, and Coccoluto to breach the Confidential Information Provisions in their respective Agreements before departing GRI for CrossCountry.

144.     As a direct, proximate, and foreseeable result of Marquis' tortious interference, GRI has suffered and, unless Defendants are enjoined as requested herein, will continue to suffer substantial and irreparable harm for which there is no adequate remedy at law.  Such harms include, but are not limited to, wrongful use of GRI's Confidential Information, impairment of the value of such information, and impairment of GRI's business relationships and customer goodwill.

145.     GRI has a substantial likelihood of success on the merits of this claim due to Defendants' knowledge of GRI's business relationships, including its relationships with its

employees, and his intentional and unjustified interference with those relationships.

146.   The threat of harm to GRI in the absence of injunctive relief as requested herein far outweighs the threat of any harm to Defendants if injunctive relief is granted.   GRI faces irreparable harm in the form of loss of customer goodwill and relationships.   In contrast, there is no hardship imposed on Defendant.   Defendant's only burden is to comply with the law and his Agreements, compete fairly and lawfully in the market, and refrain from reaping any illicit gain or benefit from his unlawful, unfair, and tortious conduct toward GRI.

147.   The public interest favors preventing Defendants from reaping illicit gains by tortiously interfering with GRI's valid employee agreements, including by inducing other current or former GRI employees to misappropriate Confidential Information in breach of their respective employee agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Guaranteed Rate, Inc. respectfully requests that the Court grant the following relief in favor of GRI and against Defendants (without waiving or limiting any other relief that may be available to GRI):

(a)  Enter a judgment in favor of GRI and against Defendants on all Counts;

(b)  Grant expedited discovery sufficient to allow GRI to ascertain the full nature and extent of Defendants' contractual and fiduciary duty breaches and other unlawful conduct as they relate to GRI's Confidential Information and employee, borrower, and referral partner non-solicitation covenants;

(c)  Preliminarily and permanently enjoin Defendants from directly or indirectly using, transferring, copying, or disclosing to any individual or entity, any GRI Confidential Information (including, but not limited to, any and all information

relating to, evidencing, or derived in whole or in part from information about GRI's customers or referral partners) or from otherwise violating the Confidential Information Provisions of Defendants' respective Agreements with GRI;

(d) Enter an order requiring Defendants, and any and all persons acting by or under their authority or in privity or concert with them, to return any and all Confidential Information in Defendants' possession, custody, or control; to immediately turn over and deliver to GRI, and permanently uninstall and delete from each of their respective computers and other information storage media and devices, all GRI Confidential Information and all other property of GRI, however stored or maintained, and all paper and electronic copies thereof, including without limitation any and all information related to, evidencing, or derived in whole or in part from information about GRI's customers;

(e) Enter an order requiring that Defendants immediately cease and desist from directly or indirectly soliciting any GRI employees to leave their employment with GRI;

(f) Enter an order requiring that Defendants immediately cease and desist from directly or indirectly soliciting any customers who have a business relationship with GRI;

(g) Enter an order requiring that Defendants immediately cease and desist from directly or indirectly soliciting, offering or providing services to, or seeking services from, any past or present vendor or referral partner of GRI whom Defendants learned of or became acquainted with during their employment with GRI;

(h) Enter an order requiring Defendants to disgorge any profits they have a received as a result of their wrongful acts, including all compensation Defendants received

during the period in which they were in breach of their fiduciary duties while employed by GRI;

(i) Award monetary damages for those claims for which monetary damages are available in this proceeding in an amount to be proven at trial;

(j) GRI's attorneys' fees and all costs and expenses related to this action; and

(k) Such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

GRI demands a jury trial on all issues so triable.

DATED: September 24, 2021         Respectfully submitted,

GUARANTEED RATE, INC.

By:/s/ Reid J. Schar
One of Its Attorneys

Reid J. Schar
Andrew F. Merrick
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: 312 222-9350
Facsimile: 312 527-0484
rschar@jenner.com
amerrick@jenner.com

*Counsel for Guaranteed Rate, Inc.*